IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

SHEILA GUND,

          Plaintiff,

     v.

MARION COUNTY, and STATE OF OREGON,

          Defendants.

_____

Case No. 6:24-cv-01448-MC

OPINION AND ORDER

MCSHANE, Judge:

Plaintiff Sheila Gund brings this action against Defendants Marion County and the State of Oregon. Second Am. Compl., ECF No. 32. Ms. Gund is deaf and was a witness and victim in what authorities believed to be a domestic violence incident. She communicates through American Sign Language ("ASL"). Her claims stem from a criminal investigation conducted by the Marion County Sheriff's and District Attorney's Offices, as well as the ensuing criminal proceedings administered by the Oregon Judicial Department.

Before the Court are two motions for summary judgement filed by Defendants. Or. Mot., ECF No. 73; Marion Cnty. Mot., ECF No. 86. The State moves for summary judgment on Plaintiff's claims under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). Marion County moves for summary judgment on Plaintiff's claims under the ADA, the Rehabilitation Act, and Or. Rev. Stat. § 659A.142; as well as a claim under 42 U.S.C. § 1983 ("Section 1983"), a claim of false imprisonment, and a claim her rights as a crime victim were violated under the Oregon

1 – OPINION AND ORDER

Constitution, Or. Const. art. I, § 42. Plaintiff's claims against Marion County encompass conduct by Sheriff's Deputies and Assistant District Attorneys.

For the reasons set forth below, Defendant State of Oregon's Motion for Summary Judgment (ECF No. 73) is GRANTED, and Defendant Marion County's Motion for Summary Judgment (ECF No. 86) is GRANTED.

## PROCEDURAL BACKGROUND

Prior to the filing of the summary judgment motions, on December 6, 2024, the Court granted the State's Motion to Dismiss Plaintiff's claims under the ADA, Rehabilitation Act, and Oregon state law. ECF No. 16. Thereafter, Plaintiff filed a Second Amended Complaint. 2d Am. Compl. ("SAC"), ECF No. 32. The State again moved to dismiss the Second Amended Complaint, which the Court granted in part and denied in part on April 9, 2025, allowing Plaintiff's ADA and Rehabilitation Act claims to proceed. ECF No. 27. On October 16, 2025, the Court dismissed Plaintiff's claims against Defendant Santiam Memorial Hospital. ECF No. 65.

The remaining claims are for violations of the ADA against the State and the County (First Claim); violations of the Rehabilitation Act against the State and the County (Second Claim); violations of the Fourth Amendment against the County (Third Claim); violations of Oregon disability discrimination law, Or. Rev. Stat. § 659A.142, against the County (Fourth Claim); for false imprisonment under Oregon law against the County (Fifth Claim); and for violations of Plaintiff's crime victim rights under the Oregon Constitution against the County (Sixth Claim).

## LEGAL STANDARD

Upon a motion for summary judgment, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts

2 – OPINION AND ORDER

showing that there is a genuine" dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* To defeat summary judgment, a nonmoving party must do more "than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

## EVIDENTIARY ISSUES

The State identifies several potential contradictions with prior testimony created by Plaintiff's Declaration filed alongside her Response to the State's Motion. Or. Reply 2–4, ECF No. 87. Plaintiff's Declaration is dated January 22, 2026 and it appears to contradict material portions of her testimony given in an earlier deposition. Gund Or. Decl., ECF No. 85

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal citations and quotations omitted). Proceeding with caution against drawing credibility determinations when considering summary judgment (*id.*), the Court determines whether the "inconsistency between [Plaintiff's] deposition testimony and subsequent affidavit . . . [is] clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009). Accordingly, the Court may strike the later affidavit.

3 – OPINION AND ORDER

Here, Plaintiff's Declaration contradicts her deposition testimony regarding the presence of two interpreters at a hearing held on October 11, 2023. At her deposition taken October 23-24, 2025, Plaintiff testified as follows regarding interpreters at the hearing (Gund Dep. 38:6–19):[1]

> Q    Do you ever recall there being two interpreters at any hearing in the Jimerson matter?
> A    On October 11th, I think so.
> Q    Well, that's the discussion we're just having, and you just said there weren't.
> A    That's because at the beginning one showed up, and then court was postponed, and then a second one showed up.
> Q    Did they delay the substance of the hearing until the second one showed up?
> A    Yes.
> Q    So there was an ASL interpreter for you and an ASL interpreter for Mr. Jimerson?
> A    Yes.

In Plaintiff's Declaration, she stated the following (Gund Or. Decl. ¶ 26):

> On October 11, 2023, at 3:30 p.m. Mr. Jimerson appeared at the Marion County Courthouse Case No. 23CR43009 to plead not guilty before Judge Tiffany J. Underwood. I appeared for that court appearance. I entered the courtroom and did not see two interpreters. I saw that there was one interpreter, Lisa Crawford, who interpreted for Mr. Jimerson, but there was no interpreter for me. Neither the Oregon Judicial Department nor the Marion County District Attorney provided an ASL interpreter for me. I had trouble seeing the interpreter from where I was sitting in the courtroom, as the interpreter was standing between Mr. Jimerson, who was at counsel table, and the judge. I tried moving my seat, but it did not help.

In addition, Plaintiff contradicts her deposition testimony regarding her ability to follow the proceedings on March 14, 2024. At her deposition, Plaintiff testified as follows regarding accommodations at the March 14, 2024 (Gund Dep. 47:8–48:1):

> Q    So let's talk about March 14th, then. Tell me about what you recall about that one now that we have sorted that out.
> A    I remember thinking that was going to be the day that I would finally get an ASL interpreter showing up for me, that there would be a second interpreter, but there was only one for JJ. And I think the judge kind of put everything on hold, and they had a discussion about the interpreter for me.

---

[1] Portions of Plaintiff's deposition were filed with the Court by different parties. Abrams Decl. Ex. A, ECF No. 74; Hawkins Decl. Ex. 200, ECF No. 86-1.

4 – OPINION AND ORDER

> And they were taking my request pretty seriously, and they decided that it would be best if they moved my placement and moved me out and they rearranged some people in the courtroom so that there was, like, the D.A., JJ, and me and the interpreter so that I was able to see the interpreter more clearly. So we moved everybody around in the courtroom so that I could see better.
>
> Q    And did that resolve your difficulties on that day?
> A    Yes.

In contrast, in Plaintiff's Declaration, she stated the following (Gund Or. Decl. ¶ 42):

> There was an interpreter for Mr. Jimerson. I had trouble seeing the interpreter because the interpreter stood in front of Mr. Jimerson. As a result of not having a designated interpreter, I was unable to follow the proceedings or participate meaningfully in them. The court proceeding ended, and people left the courtroom. I could not understand what was going on.

As to these material conflicting statements, there is no room for ambiguity. Plaintiff's subsequent statements are not merely elaborations upon or explanations of her prior testimony. *Yeager*, 693 F.3d at 1081 (citing *Van Asdale*, 577 F.3d at 999). Nor has Plaintiff shown these inconsistencies constitute "newly-remembered facts, or new facts, accompanied by a reasonable explanation." *Id.* (citing *Cleveland v. Pol'y Mgmt. Sys. Corp.,* 526 U.S. 795, 806–07 (1999)). At the hearing held on Defendants' Motions, Plaintiff did not give the Court reason to disregard these "extreme" disparities between her declaration and her deposition. *Id.* The Court therefore proceeds with Plaintiff's deposition testimony as to the above inconsistencies and STRIKES the corresponding portions of Plaintiff's Declaration accompanying her Response to the State's Motion (ECF No. 85). Other potential inconsistencies not discussed here are not material or can be resolved consistently with the undisputed facts as set forth below.

<b><u>SUMMARY OF UNDISPUTED FACTS</u></b>

### I.    <u>Events at the World Deaf Timberfest</u>

Plaintiff has been deaf from birth and communicates primarily through American Sign Language ("ASL"). Gund Dep. 11:20–22. During the Labor Day weekend of 2023, Plaintiff

5 – OPINION AND ORDER

attended the World Deaf Timberfest at Camp Taloali in Marion County, Oregon with her children and her partner, John John Jimerson (Mr. Jimerson). Gund Or. Decl. ¶ 11. Plaintiff has six children; Priscilla Webster, Zxavian Gund, Z.S., T.S., K.S., and J.J. *Id.* ¶ 7. Except for Priscilla, Plaintiff's children are able to hear. Gund Dep. 70:14–15, 70:16–21.

In the early morning hours of September 3, 2023, around 5:15 a.m., following a "drinking contest" the night before, Plaintiff states there was a "racially biased incident" in which some white campers singled out Mr. Jimerson, who was one of the few African American campers at the event. Gund Marion Cnty. Decl. ¶ 16, ECF No. 92. Mr. Jimerson then returned to the SUV where Plaintiff and the children were located. *Id*. Plaintiff testified that Mr. Jimerson was punching the car door over and over. Gund Dep. 126:7–19. Plaintiff explains Mr. Jimerson then accidentally hit her with the car door, which made her nose start bleeding. *Id.* at 113:21–25, 123:19–125:16.

Plaintiff asked her children, who had woken up from the commotion, to call 911. Gund Dep. 135:3–9; Z.S. Aff. ¶ 9, ECF No. 98. Z.S., Zxavian, and a friend, A.N., spoke to the operator. Z.S. Aff. ¶¶ 10–11. A record of the 911 call indicates the callers reported Plaintiff had blood coming mouth of her mouth and that their "stepdad had punched mom in [the] mouth." Bastian Decl. Ex. 1, ECF No. 91; Abrams Decl. Ex. C, ECF No. 74; Z.S. Aff. ¶ 10.

## II.    <u>Marion County Officers' Response</u>

Around 6:45 a.m. on September 3, 2023, a fire truck, an ambulance, and a Sheriff's patrol car arrived in response to the 911 call. Gund Marion Cnty. Decl. ¶ 29. Two Marion County Sheriff's Deputies approached Plaintiff. *Id.* ¶¶ 31–33. One was Deputy Isabel Federico. Federico Dep. 38:1–9.[2] Deputy Federico learned Plaintiff was deaf and asked for help from others who were present to communicate with Plaintiff. *See id.* at 32:5–6, 38:7–13. At one point, Deputy

---

[2] Portions of Deputy Federico's deposition are provided by different parties. Hawkins Decl. Ex. 6, ECF No. 86-1; Bastian Decl. Ex. 4, ECF No. 91.

6 – OPINION AND ORDER

Federico guided Plaintiff to the side of her vehicle, away from others, and told her to wait there so she could answer questions. *Id.* at 107:13–108:5. Plaintiff was not handcuffed. *Id.* at 108:6–7.

Plaintiff and Deputy Federico communicated through Noah Albers. Gund Dep. 108:14–109:1; Federico Dep. 32:13–33:8, 37:1–5. Mr. Albers's mother was the chairperson of the Word Deaf Timberfest. Albers Dep. 13:19–21, ECF No. 86-1 at p.59–66. She asked Mr. Albers to interpret for Plaintiff when Deputy Federico was seeking assistance. *Id.*; Federico Dep. 32:21–33:3. Mr. Albers' first language was ASL, and he had interpreted between ASL and spoken English for his parents for most of his life. Albers Dep. 13:24–14:5.

Deputy Federico spoke to Plaintiff through Mr. Albers for approximately forty-five minutes to one hour. Federico Dep. 29:18–19; Gund Dep. 112:11–13. Plaintiff told Mr. Albers she objected to him serving as her interpreter at the time. Gund Dep. 108:15–20. Plaintiff observed Mr. Albers used a "lower-level" sign language. Gund Marion Cnty. Decl. ¶ 34. Plaintiff did not tell the responding deputies Mr. Albers was not fluent in ASL. Gund Dep. 111:23–25. However, Plaintiff states Mr. Albers did not interpret everything she said to Deputy Federico. *See* Gund Marion Cnty. Decl. ¶ 37.

Deputy Federico testified she was not aware of any objections Plaintiff had to Mr. Albers interpreting. Federico Dep. 38:20–22. She was not aware of any specific additional accommodation requests. *Id.* at 39:11–13. Deputy Federico never asked Mr. Albers if Plaintiff was having difficulty understanding his interpretation. *Id.* at 67:16–18. She did not assess what "auxiliary aid" Plaintiff preferred aside from Mr. Albers' interpretation. *Id.* at 69:19–22. She believed Mr. Albers was effectively communicating in ASL, but did not attempt to verify Mr. Albers' qualifications as an interpreter. *Id.* at 84:21–25, 87:16–18. Deputy Federico had an app on her phone "that would allow [her] to call for interpreters," but she did not know, and she

7 – OPINION AND ORDER

did not investigate, whether it could be used for ASL interpretation, such as by live video call. *Id.* at 30:9–11, 32:7–12. Deputy Federico testified she understood from Plaintiff that "[Plaintiff and Mr. Jimerson] were sitting around having a drinking contest when things started getting violent. [Plaintiff and Mr. Jimerson] were sitting around a fire when a group of guys were trying to start a fight with Mr. Jimerson." *Id.* at 57:5–10; *see also id.* at 63:15–21.

Prior or at the same time Deputy Federico spoke to Plaintiff, the Sheriff's Deputies found Mr. Jimerson asleep or passed out in Plaintiff's SUV. Gund Dep. 115:16–18; Labarthe Dep. 13:14–20, 14:3–12, ECF No. 86-1. The Deputies were able to unlock the SUV and get to Mr. Jimerson, waking him up and removing him from the vehicle. Labarthe Dep. 14:20–21. Mr. Jimerson was arrested. Gund Marion Cnty. Decl. ¶ 32. The responding deputies left with Mr. Jimerson and shortly thereafter, Plaintiff went to sleep in her SUV. Gund Dep. 120:9–23.

### III.    Judicial Proceedings

Plaintiff identifies nine instances when she contends the Oregon Judicial Department ("OJD") failed to reasonably accommodate her disability during the judicial proceedings related to Mr. Jimerson's case.

#### A.    September 5, 2023

On September 5, 2023, Plaintiff went to Mr. Jimerson's first court appearance at the Marion County courthouse annex on Aumsville Highway. Gund Dep. 20:25–21:3. Underwood Decl. ¶ 1; ECF No. 80. An ASL interpreter was present in the courtroom. Gund Dep. 23:9–11; Underwood Decl. ¶ 3.

Prior to the September 5 hearing, Plaintiff called a victim's assistance hotline, which is not operated by OJD. Gund Dep. 158:7–9; Or. Mot. 6. OJD was closed on September 3 and 4 for the holiday weekend. Gund Dep. 20:1–7. Plaintiff arrived at the courthouse and requested an

interpreter from the front desk at 12:30 p.m. on September 5. Gund Dep. 18:19–19:1, 20:1–18, 21:4–7. The hearing for Mr. Jimerson's arraignment was held at 3:00 p.m. *Id.* at 20:8–10. Other than this particular request, Plaintiff testified she did not recall additional contact with OJD staff regarding advance requests for an interpreter for herself at any specific hearing.[3] Gund Dep. 39:5–12, 39:18–40:7, 201:19–23.

Plaintiff attended the September 5, 2023, proceedings held before Judge Tiffany J. Underwood. Gund Dep. 20:8–10, 22:5–7. Plaintiff was able to voluntarily address the court through the ASL interpreter who was present in the courtroom and was able to communicate that she was not a victim and that she wanted her own ASL interpreter. *Id.* at 23:1–14; Underwood Decl. ¶ 3 ("As the named victim, I invited Ms. Gund to address the Court, and she did so.").

### B.  October 11, 2023

On October 11, 2023, Plaintiff attended Mr. Jimerson's plea hearing. Gund Dep. 37:10–17. There were two ASL interpreters in the courtroom, Damon Thayer and Lisa Crawford. *Id.* at 38:6–8, 17–19; Underwood Dec. ¶ 4. Plaintiff did not separately inform OJD in advance she would be attending this hearing. *See* Gund Dep. 39:5–12. Neither the lawyers in the courtroom nor the judge asked Plaintiff to participate in any manner. *Id.* at 38:20–25. Plaintiff's only role was as an observer. *Id.* at 39:1–3.

### C.  November 16, 2023

On November 16, 2023, Plaintiff came to Marion County on the day of a status conference in Mr. Jimerson's case. Gund Dep. 40:16–19. A status conference is not open to the public and is

---

[3] There is evidence Plaintiff attempted to communicate with OJD by calling the telephone number "503-388-0812." That telephone number is used to send texts to parties in cases reminding them of hearing dates, cancellations, or rescheduled dates. Hukari Decl. ¶ 2, ECF No. 76. It is not staffed or monitored. *Id.* It cannot receive verbal or texted messages. *Id.* It cannot record any incoming communications. *Id.*

9 – OPINION AND ORDER

generally held in the presiding judge's chambers with only counsel for the parties in attendance. *E.g.*, Hawkins Decl. at p.80–81.

The November 16 status conference was held in Judge Courtland Geyer's chambers with only counsel in attendance. Geyer Dec. ¶ 3, ECF No. 75. Plaintiff sat outside in the hallway during the status conference and had no role in the proceeding. *Id.*; Gund Dep. 41:1–8.

### D.  December 13, 2023

The December 13, 2023, hearing had been delayed from its original date of December 6, 2023. Gund Dep. 41:9–13. There was an ASL interpreter in the courtroom. Geyer Decl. ¶¶ 4, 6, ECF No. 75. Plaintiff had no role other than as an observer and neither the lawyers in the courtroom nor the judge asked Gund to participate in any manner. Gund Dep. 43:16–23; ECF No. 108 (transcript of proceedings for December 13, 2023 hearing in *State v. Jimerson*). Plaintiff testified to difficulty following the proceedings on December 13 due to there being only one interpreter. Gund Dep. 44:21–25.

### E.  January 4, 2024, and March 7, 2024

On January 4, 2024, and March 7, 2024, Gund went to the Marion County courthouse on the dates of status conferences in Mr. Jimerson's case. Gund Dep. 46:3–5, 47:5–7. On both dates, the status conferences were held in Judge Geyer's chambers with only counsel in attendance. Geyer Decl. ¶¶ 5–6. Plaintiff sat outside in the hallway and had no role in the proceeding. Gund Dep. 46:3–5, 47:5–7. When Plaintiff sought to communicate with attorneys from the Marion County District Attorney's Office following a status conference they communicated by handwritten or typed notes. *E.g.*, Gund Dep. 162:14–20; Hopkins Dep. 9:24–11:14, 13:13–19, ECF No. 86-1 Ex. 11.

### F.  March 14, 2024

10 – OPINION AND ORDER

On March 14, 2024, Plaintiff went to the Marion County courthouse for a hearing on a motion to exclude witnesses in Mr. Jimerson's case. Gund Dep. 47:8–14. There was one interpreter present. *Id.* The presiding judge "kind of put everything on hold" to determine how to accommodate Plaintiff and allowed Plaintiff to move to the counsel's table so that she would have the same view of the interpreter as Mr. Jimerson. *Id.* at 47:8–48:1. Neither the lawyers in the courtroom nor the judge asked Plaintiff to participate in any manner. *Id.* at 48:14–23. Plaintiff had no role other than as an observer at the hearing. *Id.* at 48:2–11. Plaintiff testified she could see the interpreter more clearly from where she was relocated and that this resolved her difficulties. *Id.* at 47:24–48:1.

### G. June 27, 2024

On June 27, 2024, Plaintiff went to the Marion County courthouse on the day of a status conference in Mr. Jimerson's case. Gund Dep. 48:12–16. Like the previous status conferences, it was not open to the public and Plaintiff waited in the hallway. *Id.* at 48:17–19; Gund Or. Decl. ¶ 44; Geyer Decl. ¶ 8.

### H. July 11, 2024

On July 11, 2024, Plaintiff attended a hearing in Mr. Jimerson's case to lift the no-contact order between her and Mr. Jimerson. Gund Dep. 51:2–4. There was one interpreter at the hearing. *Id.* at 51:5–7; Tracey Decl. ¶ 3, ECF No. 79. In fact, there were supposed to be two interpreters, but one did not show up. *See* Snyder Decl. Ex. 13, ECF No. 84. The presiding judge, Judge Matthew Tracey, invited Plaintiff to sit at counsel's table to better see the interpreter. Gund Dep. 52:15–18; Tracey Decl. ¶ 5. Plaintiff communicated with the interpreter that she wanted to be able to see clearly and testified, "between [her] and the interpreter, we ensured I was able to see." Gund

Dep. 52:15–18. Plaintiff observed the hearing and neither the lawyers in the courtroom nor the judge asked Plaintiff to participate in the hearing. *Id.* at 51:16–24.

Thereafter, Mr. Jimerson's case was dismissed. Gund Or. Decl. ¶ 47.

## DISCUSSION

**I.    ADA and Rehabilitation Act Claims**

### A. Applicable Law

### 1. ADA and Rehabilitation Act in General

Title II of the ADA and Section 504 of the Rehabilitation Act are "interpreted coextensively." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021). To establish a violation of the ADA or the Rehabilitation Act, a plaintiff must (1) be a qualified individual with a disability, (2) be denied a reasonable accommodation that is needed "to enjoy meaningful access to the benefits of public services," (3) by a public entity for the ADA, or by a program that receives federal funding for the Rehabilitation Act. *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 968 (9th Cir. 2021). The denial of services must be "by reason of" the plaintiff's disability. *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).

The parties do not dispute Plaintiff is a person with a disability. As to persons with a hearing disability, the implementing regulations for Title II of the ADA state that a public entity must "take appropriate steps to ensure that communications" with disabled persons "are as effective as communications with others." 28 C.F.R. § 35.160(a). These regulations provide (*id.* § 35.160(b)):

> (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.
> (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context

12 – OPINION AND ORDER

in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

For deaf and hearing-impaired persons, auxiliary aids and services include (*id.* § 35.104(1)):

Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing[.]

## 2.  <u>Reasonable Accommodation</u>

A plaintiff has the burden of showing that the accommodation offered by a defendant was not reasonable and that they were not able to participate equally in the relevant communications. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001) (citing *Memmer v. Marin Cnty. Cts.,* 169 F.3d 630, 633–34 (9th Cir.1999)), *as amended on denial of reh'g* (Oct. 11, 2001); *see also Alexander v. Choate,* 469 U.S. 287, 301 (1985) (holding Rehabilitation Act requires that qualified persons with disabilities receive "meaningful access" to a public entity's services). A plaintiff must identify "specific reasonable" and "necessary" accommodations the defendant failed to provide. *Memmer*, 169 F.3d at 633. Reasonableness of an accommodation "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations." *See Vinson v. Thomas,* 288 F.3d

1145, 1154 (9th Cir. 2002) (internal citation and quotation marks omitted); *Mayfield v. City of Mesa*, 131 F.4th 1100, 1110 (9th Cir. 2025).

### 3. <u>Deliberate Indifference</u>

To recover monetary damages under Title II of the ADA or Section 504 of the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant according to the deliberate indifference standard. *Duvall*, 260 F.3d at 1138. Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood. *City of Canton v. Harris,* 489 U.S. 378, 389 (1988). A plaintiff satisfies the first requirement by alerting the public entity to their need for accommodation such that the public entity is on notice an accommodation is necessary, or when the need for accommodation is "obvious." *Duvall*, 260 F.3d at 1138. Once a public entity is on notice of the need for an accommodation, "the ADA imposes an obligation to investigate whether a requested accommodation is reasonable." *Id.* at 1136–37 ("[M]ere speculation that a suggested accommodation is not feasible falls short of the reasonable accommodation requirement; [the Rehabilitation Act] create[s] a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary." (internal quotation marks omitted)); *Wong v. Regents of the Univ. of Cal.,* 192 F.3d 807, 819 (9th Cir. 1999) (referring to "failure to carry out the obligation 'conscientiously' to explore possible accommodations"), *as amended* (Nov. 19, 1999). This duty is defendant- and accommodation-specific, such that a court will examine which defendant in an action is responsible for each reasonable accommodation a plaintiff alleges the defendant failed to provide. *See Loye v. County of Dakota*, 625 F.3d 494, 498 n.5 (8th Cir. 2010).

Crucially, deliberate indifference towards reasonable accommodation requires "an element of deliberateness" beyond mere negligence. *Duvall*, 260 F.3d at 1139. Accordingly, "deliberate indifference does not occur where a duty to act may simply have been overlooked, or a complaint may reasonably have been deemed to result from events taking their normal course," such as when "events may be attributable to bureaucratic slippage that constitutes negligence rather than deliberate action or inaction." *Id.* (citing *Ferguson v. City of Phoenix*, 157 F.3d 668, 675 (9th Cir. 1998), *as amended* (Oct. 8, 1998)).

## B. <u>Analysis</u>

### 1. <u>State of Oregon</u>

Plaintiff argues that she, as a crime victim associated with the proceedings involving Mr. Jimerson (a "title" she "played no role in assigning herself"), must be provided with accommodations by OJD to ensure her meaningful access and participation in the proceedings. Pl.'s Or. Resp. 6–7, ECF No. 83. The State does not contest Plaintiff is a qualified individual, but argues OJD either provided Plaintiff with reasonable accommodations at the court events she attended, or did not act with deliberate indifference. Or. Mot. 13–14, 16.

Plaintiff identifies the failure to provide a *second* ASL interpreter during public in-court hearings as a failure to reasonably accommodate Plaintiff. In these instances, to be discussed below, a single ASL interpreter, which the State provided for Mr. Jimerson, is the baseline. The Court must assess whether Plaintiff was deprived of communications as effective as those enjoyed by non-disabled persons not in the absence of any interpretation at all, but rather in the absence of a second, dedicated ASL interpreter. *Duvall*, 260 F.3d at 1137.

Plaintiff identifies nine instances of failure to accommodate associated with the proceedings in Mr. Jimerson's case. The Court proceeds by considering the instances in turn,

15 – OPINION AND ORDER

grouped by similar circumstances based on Plaintiff's involvement and the accommodations provided. Because the Court finds no genuine dispute of material fact as to either reasonable accommodation or deliberate indifference arising from any instance Plaintiff identifies, summary judgment in favor of the State is appropriate on Plaintiff's disability-based claims.[4]

### a. In-Chambers Events

The events that occurred in a presiding judge's chambers between counsel do not present any failure to accommodate Plaintiff. These include four "status conferences" or "pretrial conferences": November 16, 2023, Gund Dep. 40:16–19, 41:1–8 ("But whatever was happening with the judge and the attorneys was out of your presence? . . . . That's correct."); January 4, 2024, *id.* at 46:3–5 ("So on January 4th, 2024, you were pretty much just out in the hallway? . . . . Yes, m-hm."); March 7, 2024, *id.* at 46:23–47:7 ("So on March 7th, was that one where you were just in the hallway? . . . . I'm pretty sure that's correct, yeah."); and June 27, 2024, *id.* at 48:17–23 ("And is that another one where you ended up out in the hallway? . . . . Yes, I believe so. . . I was waiting for somebody to come to talk to me.").

These events were held in the presiding judge's chambers between counsel in Mr. Jimerson's case. Gund Dep. at 41:1–8; Geyer Decl. ¶¶ 3, 5, 7. Because Plaintiff was not a part of these closed meetings, and she was not excluded because of her disability, the absence of an interpreter in no way disadvantaged Plaintiff. *See Duvall*, 260 F.3d at 1137–38 (discussing *Memmer*, explaining, "[w]e first held that no accommodations were necessary at the pre-trial stage because those hearings did not involve examining exhibits or reading documents, and [the plaintiff] was therefore not disadvantaged in any way by the denial of the [requested accommodation]").

---

[4] As a result, the Court need not reach the State's argument that OJD does not receive federal financial assistance such that it is not subject to the Rehabilitation Act. Even if OJD is subject to the Rehabilitation Act, Plaintiff's claims fail.

### b. Hearing on October 11, 2023

A second interpreter for Plaintiff was present at the hearing held October 11, 2023. Gund Dep. 38:6–19. There was no failure to reasonably accommodate Plaintiff on this date because Plaintiff received the accommodation she had sought.

### c. Hearings on March 14, 2024, and July 11, 2024

Plaintiff attended hearings on March 14, 2024, and July 11, 2024, at which one ASL interpreter was present. A plaintiff can create a genuine dispute of material fact as to the reasonableness of an accommodation by presenting evidence the provided accommodations nevertheless left her short of equal participation and access to a proceeding. In *Duvall*, the Ninth Circuit considered evidence that the plaintiff had "examined the court's proposed accommodation—the assistive listening system—prior to rejecting it, . . . evidence regarding the insufficiency of this device[,] . . . [and] detailed testimony explaining the difficulties [the plaintiff] experienced following the proceedings in his case." 260 F.3d at 1137–38. In the face of contrary evidence of the plaintiff's ability to "communicate effectively in one-on-one conversation" using the accommodations provided, *Duvall* held the plaintiff had "presented sufficient evidence to create a material issue of fact as to whether the refusal to provide" the additional accommodations identified by the plaintiff "prevented him from participating equally in the hearings at issue." *Id.*; *see also Memmer*, 169 F.3d. at 634 (holding plaintiff who was blind "failed to carry her burden of proof under the ADA" because she did not offer evidence that she evaluated the given accommodation to find it inadequate or evidence that the provided "reader" was "a less able or sufficient reader" than her preferred reader).

As to these events, informed by *Duvall*, there is no comparable dispute of material fact. As to March 14, 2024, Plaintiff testified at her deposition that OJD staff "put everything on hold" and

"rearranged some people in the courtroom" so that Plaintiff could sit in a position where she could see the interpreter "more clearly." Gund Dep. 59:11–23. Plaintiff was an "observer" at this hearing, and the presiding judge did not address her or ask her to participate aside from arranging for her to move in the courtroom. *Id.* at 48:2–11. Plaintiff attested that this relocation "resolve[d] [her] difficulties on that day." *Id.* at 47:24–48:1 ("And did that resolve your difficulties on that day? . . . . Yes."). On July 11, 2024, Plaintiff attended another hearing where she was an observer. *Id.* at 51:2–4; 51:16–24. There, when Plaintiff "struggled to see the interpreter" at first, she informed the interpreter she "wanted to be able to see clearly." *Id.* at 52:2–14. Plaintiff then relocated in the courtroom with the assistance of the interpreter, who helped "ensure[] [she] was able to see."[5] *Id.* at 51:15–18 ("So after you made those communications, what happened? Were you moved? . . . . Yes. Between me and the interpreter, we ensured that I was able to see. We worked it out."); Tracey Decl. ¶¶ 5–6.

In addition, as to deliberate indifference, Plaintiff points to an email sent on March 13, 2024 by Kimberly Taylor, Judge Geyer's Judicial Assistant. Snyder Decl. Ex. 13. The email states, "I ordered an interpreter for the victim and the defendant. We will see how many show up." *Id.* The email shows an OJD employee made arrangements *consistent* with Plaintiff's preferred accommodation. Viewing the facts in the light most favorable to Plaintiff, the OJD employee's concession of doubt whether two interpreters would certainly show up reflects, as a matter of law, at most negligence—or "bureaucratic slippage"—towards ensuring Plaintiff's preferred

---

[5] Plaintiff refers to a declaration by Jana Baker, Mr. Jimerson's former attorney (Pl.'s Or. Resp. 11): "When the second ASL interpreter did not appear to accommodate the victim, Judge Tracey, who was presiding over the hearing because Judge Geyer had recused himself, discussed the idea of calling the hearing an arraignment to get around not having two interpreters. I specifically said it did not matter what the hearing was called, Ms. Gund still has the right to an interpreter at any proceeding. Judge Tracey said, 'Good point,' and the conversation then stopped with calling the hearing an arraignment." Baker Decl. ¶ 6, ECF No. 25. Excluding hearsay statements, which cannot create a genuine dispute of material fact, *Gamez-Morales v. Pac. Nw. Renal Servs., LLC*, 304 F. App'x 572, 575 (9th Cir. 2008), the declaration confirms a second interpreter *was* requested and corroborates the accommodations provided to Plaintiff.

accommodation, let alone a reasonable accommodation. *See Duvall*, 260 F.3d at 1139 (citing *Ferguson,* 157 F.3d at 675). Unlike in *Duvall*, where the defendant's employees failed to inquire about the possibility of the plaintiff's requested accommodations, OJD employees took concrete steps within their control to arrange for Plaintiff's preferred accommodations. *Id.* at 1140.

Because the undisputed facts indicate Plaintiff was effectively accommodated and there is no evidence of deliberate indifference, Plaintiff's claims must fail in regard to the March 14 and July 11, 2024 events.

### d. **First Hearing on September 5, 2023**

Plaintiff has not introduced a genuine issue of material fact to survive summary judgment concerning reasonable accommodation at the first hearing in Mr. Jimerson's case on September 5, 2023. Notice of a request for accommodation is required for assessing a public entity's duty to accommodate and to establish deliberate indifference. *Updike v. Multnomah County*, 870 F.3d 939, 957 (9th Cir. 2017) (quoting *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1207 (9th Cir. 2016)); *see also Armstrong v. Newsom*, 724 F. Supp. 3d 886, 917–18 (N.D. Cal. 2024). In *Updike*, despite the plaintiff's multiple requests for accommodation while in pretrial custody and his pretrial release report indicating he needed an interpreter, he had to stay an extra night in jail when the State failed to accommodate his disability for his arraignment as originally scheduled. 870 F.3d at 943–45. Nevertheless, the *Updike* court affirmed summary judgment for the State on the issue of deliberate indifference because the State gave evidence that in setting the arraignment, it had reviewed the "booking register," which did not indicate the plaintiff needed an interpreter. *Id.* at 951–52 (referring to "bureaucratic slippage" in failure to provide an interpreter, falling short of deliberate indifference).

Here, Plaintiff has not "provided sufficient evidence to create a triable issue" as to whether OJD "had notice of [her] need for [] accommodation" beyond the accommodation already arranged for Mr. Jimerson, yet "failed despite [] requests to take the necessary action." *Duvall*, 260 F.3d at 1140. The undisputed facts establish Plaintiff notified OJD she needed an interpreter approximately three hours before a hearing where she was not a required participant, and any earlier notice was over a holiday weekend. *See* Gund Dep. 18:19–19:9. This was Plaintiff's first request to OJD for an interpreter related to these proceedings.[6] *Id.* at 20:1–18. While OJD was on notice that Mr. Jimerson needed an interpreter when arranging for his first appearance following his arrest, the same cannot be said for Plaintiff, whose presence and accommodation needs were not similarly known or anticipated by OJD.

In addition, Plaintiff testified she was able to communicate with the judge through the interpreter who was present. Gund Dep. 23:12–14 ("So you were able to access the judge through the interpreter in the courtroom? . . . . Yes."). Though Plaintiff also states it was "hard to see the interpreter" later during the hearing, any remaining difficulty does not suggest any "real hindrance" given Plaintiff had been able to "st[and] up in the front" to address the judge earlier in the same hearing. *Id.* at 23:8, 23:21–25; *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 867 (9th Cir. 2022) ("[T]he test is whether an individual has received an auxiliary aid sufficient to prevent any 'real hindrance' in her ability to exchange information." (quoting *Silva v. Baptist*

---

[6] Plaintiff went through divorce proceedings in Oregon in [2018] and used an ASL interpreter. Gund Or. Decl. ¶ 9. Though Plaintiff at one point suggests the State "should have been on notice from Ms. Gund's prior divorce proceedings that she required an interpreter" (Pl.'s Or. Resp. 12), she does not point to any evidence that a record of her required accommodations exists, such that OJD is on notice an interpreter is needed for any subsequent proceedings in any OJD court that Plaintiff wishes to attend. *Armstrong*, 724 F. Supp. 3d at 901–02 (finding "Defendants were on notice that DPV class members require vision accommodations to read and write parole-related documents by virtue of having been assigned a DPV disability code by prison staff" even without class members individually requesting interpreters).

*Health S. Fla.*, Inc., 856 F.3d 824, 835 (11th Cir. 2017)). No question of fact remains here. *See Mayfield*, 131 F.4th at 1111.

Given the timing of Plaintiff's initial request and that Plaintiff's presence was not required, even if she understandably felt an obligation to be there, the provision of a single interpreter with whom Plaintiff was able to communicate was a reasonable accommodation for the September 5 hearing. *See Updike*, 870 F.3d at 951–52.[7] There is likewise no suggestion of deliberate indifference by OJD. *Id.*

### e. December 13, 2023 Hearing

Plaintiff has not introduced a genuine dispute of material fact concerning accommodations at the December 13, 2023 hearing. Plaintiff testified to difficulty following the proceedings on December 13, 2023. Gund Dep. 44:21–25. However, there is no evidence showing that OJD was on notice Plaintiff would attend and that she would request a second interpreter for this date to establish lack of reasonable accommodation and show deliberate indifference. Though Plaintiff argues she notified "multiple employees of the [State] . . . she intended to attend every one of Mr. Jimerson's court appearances" (Pl.'s Or. Resp. 12), Plaintiff's testimony does not indicate she notified OJD of her need for a second interpreter except for on September 5. *Id.* at 39:13-40:7.[8] Plaintiff's circumstances stand in contrast to those of pretrial detainees or arrestees with documented needs for interpretation services associated with proceedings in their respective cases, *Updike*, 870 F.3d at 954, or of individuals going through multiple consecutive days of in-patient care at a hospital, *Bax*, 52 F.4th at 869. Plaintiff had no formal attachment to the proceedings in

---

[7] *See also Herships v. Superior Ct.*, 2025 WL 1455816, at *3 (N.D. Cal. May 21, 2025) (granting summary judgment for defendants were not sufficiently on notice of the plaintiff's need for accommodation where "[the plaintiff] made one request at the start of his hearing for an assistive device, which was promptly accommodated by the bailiff," "[the plaintiff] did not make any other requests prior to or during the hearing," and "[the plaintiff] could hear most of the discussion during the 10-minute court proceeding"), *aff'd*, No. 25-3502, 2026 WL 1122240 (9th Cir. Apr. 24, 2026).
[8] Plaintiff also points to what appear to be screenshots of the iPhone "Notes" app. Snyder Decl. Ex. 10–12. There is no indication these notes, or their contents, were ever viewed by OJD personnel.

21 – OPINION AND ORDER

Mr. Jimerson's case as far as OJD was concerned. Without more, there is no basis for imposing on OJD an obligation to *assume* Plaintiff's presence at any given proceeding she was free to attend in Mr. Jimerson's case and accordingly provide a second interpreter absent further notice. *See Armstrong*, 724 F. Supp. 3d at 901–02.

Nor is there evidence of deliberate indifference here. *Updike*, 870 F.3d at 943–45, 951–52. Plaintiff states in her declaration attached to her Response that on October 11, 2023, "[t]he front desk staff member [at the courthouse] responded to me that she would take care of it for me for the next court date." Gund Or. Decl. ¶ 25, ECF No. 85. Even if this statement was admissible (Or. Reply. 3), there is no evidence OJD tracks the interpretation needs of non-party, non-testifying individuals interested in attending hearings for a certain case. Plaintiff's own belief her request on September 5 would cover the remaining proceedings cannot overcome the rest of the record. Gund Dep. 39:21–40:7. In particular, neither party argues Plaintiff's need for an accommodation is so "obvious" in advance of any given hearing, let alone the December 13 hearing, for which the transcript does not reflect any awareness of her presence on behalf of the court or court staff. *See generally* ECF No. 108 (transcript of proceedings); *see also* Gund Dep. 42:17–20 (stating she was present for the hearing and "kind of had to sit there quietly").

Without adopting a blanket rule that an obligation to provide reasonable accommodations rises and falls with whether an individual "specifically requests such aid," because here there is neither an indication OJD was on notice Plaintiff required further accommodations on this date, nor an indication of intent surpassing negligent bureaucratic slippage, there is no triable issue as to whether OJD failed to provide a reasonable accommodation or was deliberately indifferent in doing so. *Bax*, 52 F.4th at 869 (citing *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, J.)).

22 – OPINION AND ORDER

####   f.    Injunctive Relief

Plaintiff asserts "it is likely that she and other Deaf litigants, witnesses, and victims will continue to be denied effective communication." Pl.'s Or. Resp. 18. Such an allegation is insufficient to obtain prospective injunctive relief like the kind Plaintiff seeks. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014) (quoting *Doran v. 7-Eleven, Inc.,* 524 F.3d 1034, 1041 (9th Cir. 2008)). In fact, Plaintiff stated she has not entered an Oregon court since the last hearing in Mr. Jimerson's case on July 11, 2024. Gund Dep. 15:20–16:1. To the extent Plaintiff relies on others' potential injuries, the Court notes a party seeking injunctive relief must support its request by pointing to their own injury. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)) ("Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction.").

###   2.   Marion County

Plaintiff's ADA and Rehabilitation Act claims against Marion County involve the conduct of Sheriff's Deputies who responded to the 911 call at the Timberfest, and Assistant District Attorneys with whom Plaintiff occasionally communicated outside of the state court events she attended. Plaintiff also asserts claims under Or. Rev. Stat. § 659A.142 against Marion County, which the parties agree are essentially identical to Plaintiff's claims under the ADA and Rehabilitation Act.

####   a.   Sheriff's Deputies

In general, a deaf individual is not necessarily entitled to have an ASL interpreter "as a matter of course to achieve effective communication with [a public entity's] employees" such that

23 – OPINION AND ORDER

"the [entity] should be subject to liability for failing to provide one." *Updike*, 870 F.3d at 958. In addition, to the extent the Ninth Circuit has addressed disability rights in the context of an *investigation*, its analysis has been limited to an arrestee, as opposed to a victim or witness. *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part*, 575 U.S. 600 (2015) (recognizing claim based on "fail[ure] to reasonably accommodate the [plaintiff's] disability in the course of investigation or arrest, causing the [plaintiff] to suffer greater injury or indignity in that process than other arrestees"); *Mayfield*, 131 F.4th at 1112–13 (citing *Rosen v. Montgomery County*, 121 F.3d 154, 158 (4th Cir. 1997); *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1086–87 (11th Cir. 2007)); *see also Updike*, 870 F.3d at 943.

The context of Plaintiff's interaction with Deputy Federico defines the Court's analysis here. The *Mayfield* court contextualized "the relevant question" before it as "whether, in light of the exigent circumstances applicable in the context of the stop and arrest of a deaf motorist, the means of communication used were sufficient to allow the detained motorist to effectively exchange information with the officer so as to accomplish the various tasks entailed in the stop and arrest."[9] *Mayfield*, 131 F.4th at 1110. Plaintiff's context was substantially different. Deputy Federico engaged Plaintiff, a potential victim and witness, in an initial conversation following or concurrent with an arrest on suspicion of domestic violence in response to a 911 call. The "various tasks entailed" in an initial conversation with a victim or witness connected to suspected domestic violence are much narrower than those arising during an arrest, and no greater than achieving adequate communication of the most basic and preliminary of facts. The question of whether the

---

[9] In an arrest context, relevant "exigent circumstances" a Court may incorporate in its analysis include "the risk of physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Sheehan*, 743.F3d at 1221.

24 – OPINION AND ORDER

"means of communication used were sufficient to allow [Plaintiff] to effectively exchange information" is therefore similarly limited to the communication of such basic, preliminary facts. *Id.*; *cf. Giambalvo v. City of Tempe*, No. 24-4860, 2025 WL 2048999, at *2 (9th Cir. July 22, 2025) (assessing "real hindrance in [the plaintiff's] ability to exchange information about material matters" to her arrest, including the nature of her disability, the reason for her stop, and the charges against her (internal quotations omitted)). A fundamental distinction between this case and precedent akin to *Mayfield* is that Deputy Federico's conversation with Plaintiff was not to assist Plaintiff in any process involving Plaintiff, such as an arrest, but rather it was to aid *Deputy Federico* in her preliminary investigation in the moment. *See* Federico Dep. 56:10–25 (describing investigation in general). In particular, the relevant "benefits of public services" from which Plaintiff claims she was denied "meaningful access" do not encompass Deputies conducting an investigation consistent with Plaintiff's views.

Given the context of an early morning response to a 911 call during which Deputies made a lawful arrest arising from suspicion of domestic violence, there can be no dispute Plaintiff's disability was reasonably accommodated. First, the Marion County Sheriff's Deputies did not deny accommodation altogether, instead, the question is whether relying on Mr. Albers was a reasonable accommodation for Plaintiff. Deputy Federico quickly ascertained Plaintiff was deaf and would need interpretation assistance (Federico Dep. 32:5–6, 39:19–20), which resulted in Mr. Albers' help (*id.* at 32:21–33:8; Albers Dep. 6:11–24). Plaintiff emphasizes in briefing that her "intended message" was that "Mr. Jimerson was an innocent bystander" to a fight that occurred. Pl.'s Marion County Resp. 33, ECF No. 90.[10] Accordingly, the undisputed facts indicate that, in addition to the nature of her disability, Plaintiff effectively communicated her essential point to Deputy Federico.

---

[10] Plaintiff amended her Response to Marion County's Motion to correct the name of the document. ECF No. 99-1.

25 – OPINION AND ORDER

Federico Dep. 57:5–10 ("She just explained to me that they were sitting around having a drinking contest when things started getting violent. She said they were sitting around a fire when a group of guys were trying to start a fight with Mr. Jimerson."); *id.* at 63:15–21. Furthermore, Plaintiff's conversation with Deputy Federico did not foreclose any future communication regarding the events of that morning involving Mr. Jimerson. The undisputed facts show Plaintiff made additional statements regarding Mr. Jimerson's case, underscoring the preliminary nature of the encounter. *See, e.g.*, Gund Dep. 23:1–6 (recounting communication to judge during September 5, 2023 hearing); Hawkins Decl. Ex. 3, 4 (letters from Plaintiff received by Marion County District Attorney Victim Assistance Division on September 5, 2023); Snyder Decl. Ex. 2 (informing Plaintiff of opportunity to provide written victim statement).

To be sure, Deputy Federico did not act on Plaintiff's statement in the way Plaintiff would have preferred. *Id.* at 57:11–18; *see also* Gund Marion Cnty. Decl. ¶ 35. But whether Deputy Federico provided a reasonable accommodation does not turn on whether she believed statements from Plaintiff that she was in no way obligated to believe, nor whether she conducted her investigation in accordance with Plaintiff's view. *See Palomares v. City of Arvin*, 2026 WL 124814, at *5 (E.D. Cal. Jan. 16, 2026) (finding effective accommodation concerning plaintiff's denial of domestic violence accusation notwithstanding the fact responding officers still suspected domestic violence and arrested the plaintiff). Similarly, Plaintiff's expert report does not require a different outcome here. Plaintiff points to a report by Dr. Judy Shepard-Kegl to suggest it is "not clear that [Plaintiff's] statements regarding the accidental cause of her bleeding nose was faithfully interpreted to the officers." Shepard-Kegl Decl. ¶ 22; Pl.'s Marion Cnty. Resp. 33. First, the context of the communication at issue does not necessarily require such detail to have been effective. *See Mayfield*, 131 F.4th at 1110. In addition, Dr. Shepard-Kegl based this opinion on an

26 – OPINION AND ORDER

observation that Plaintiff's statements were "contrary to the police deputies' assumptions that this was a domestic violence complaint." Shepard-Kegl Decl. ¶ 22. But, as discussed, Deputy Federico declining to follow up on Plaintiff's version of events does not imply ineffective communication.

In context, the undisputed facts show sufficiently effective communication during a preliminary investigation. Deputy Federico's obligation to provide reasonable accommodation did not require her to obtain an interpreter, either on-site, through her app, or at a different location at a different time to collect basic facts from Plaintiff at the scene of an arrest.[11] *Mayfield*, 131 F.4th at 1112–13; *Updike*, 870 F.3d at 958.

Accordingly, Marion County is entitled to judgment as a matter of law.

### b. <u>Assistant District Attorneys</u>

First, Plaintiff argues "the County's reliance on ad hoc and inconsistent methods including written English exchanges and impromptu communications without reliable interpretive services was insufficient to ensure effective communication." Pl.'s Marion Cnty. Resp. 34; *e.g.*, Hawkins Decl. at p.91–92 (showing communication through handwritten notes). But this is not an accurate description of the contours of "effective communication" in this context. In *Mayfield*, the Ninth Circuit found "no 'real hindrance'" to the plaintiff's ability to communicate when officers who stopped the plaintiff communicated at first through "handwritten instructions" and then through "the use of a combination of written instructions, lip-reading, and/or visual demonstration" related to various "specific tasks" involved in making an arrest. 131 F.4th at 1111. There is thus nothing necessarily *unreasonable* or *ineffective* about written communication or improvised strategies that adapt to the task at hand. *See id.*; *Bax*, 52 F.4th at 870 ("We do not apply categorical rules to determine which auxiliary aids are required to achieve effective communication." (internal citation

---

[11] Even Dr. Shepard-Kegl concedes that "it is conceivable that Mr. Albers could have been recruited temporarily as a "good Samaritan to facilitate communication on site." Shepard-Kegl Decl. ¶23.

omitted)). Rather, "whether an individual has received an auxiliary aid sufficient to prevent any 'real hindrance' in her ability to exchange information" is assessed on a case-by-case basis. *Mayfield*, 131 F.4th at 1110 (quoting *Bax*, 52 F.4th at 867).

The Court does not dispute Plaintiff's assertion that "[c]ommunications with prosecutors regarding criminal proceedings, victim rights, charging decisions, and court participation, are inherently complex and consequential." Pl.'s Marion Cnty. Resp. 34. However, Plaintiff's interest in effective communication regarding Mr. Jimerson's case is no stronger than the interest in effective communication of plaintiffs encountering communication barriers during their own arrests and pretrial criminal proceedings. *See, e.g.*, *Mayfield*, 131 F.4th at 1112–1113; *Updike*, 870 F.3d at 952, 955–57; *see also Palomares*, 2026 WL 124814, at *5. Aside from reference to the method of communication and the gravity of the communication, Plaintiff does not point the Court to evidence establishing a genuine issue of material fact concerning a real and specific hindrance to her communication with Marion County prosecutors. *See Bax*, 52 F.4th at 870.

In addition, the undisputed facts do not support deliberate indifference on the part of Marion County Assistant District Attorneys.[12] Notices sent by the Marion County District Attorney's Office and received by Plaintiff advised her Mr. Jimerson could enter a plea at any appearance, at which point proceedings would be moved to the courtroom (*e.g.*, Hawkins Decl. at p.78–79 (September 6, 2023 notice of October 11, 2023 hearing):

---

[12] In her Declaration, Plaintiff describes an interaction with an unnamed Assistant District Attorney. Gund Marion Cnty. Decl. ¶ 66. Her description of this encounter where an Assistant District Attorney provided her an "update" evinces effective communication through handwritten and typed notes. *Id.* Plaintiff also explains, "[t]he Deputy District Attorney wrote a note stating . . . that the District Attorney in charge had not contacted me due to communication barriers." *Id.* Plaintiff argues this statement creates a dispute of material fact regarding reasonable accommodation. Pl.'s Marion Cnty. Resp. 34. However, the record indicates the Marion County District Attorney's Office provided, and Plaintiff received, necessary written notices regarding events in Mr. Jimerson's case. Beyond these notices, an individual prosecutor was not obligated to return Plaintiff's calls or otherwise consult with her consistent with her wishes. The decision of the "District Attorney in charge" to not communicate with Plaintiff in the first place therefore does not speak to a lack of "effective communication" or to deliberate indifference.

28 – OPINION AND ORDER

You are not required to attend. Usually status conferences are held in the judge's chambers and not open for public attendance. It is important for you to know that a defendant can plead guilty and be sentenced at any appearance. If the defendant chooses to enter a guilty plea and be sentenced, the hearing will be moved to the courtroom. If you want to give a verbal or written victim statement at sentencing, you may want to attend this hearing or provide the District Attorney's Office with a written statement to provide to the Court. If you plan to attend and/or want to give a victim statement, please inform the Victim Assistance office at 503-588-5253 or toll free at 1-866-780-0960, between 8:00am and 5:00pm, Monday through Friday. You can also contact the District Attorney's Office to confirm the date, time and location of this hearing.

On their face, the notices Plaintiff received did not contemplate communication between Marion County prosecutors and Plaintiff, even if Plaintiff was free to be at the courthouse, including on the date of in-chambers status conferences. Disability protections are not necessarily dictated by a public entity's own policies; however, the ADA and Rehabilitation Act do not require the Marion County District Attorney's Office to assume Plaintiff would be present at the time of closed status conferences and provide an interpreter in case Plaintiff sought to communicate with prosecutors on such occasions, as opposed to during scheduled appointments or in-court proceedings (*e.g.*, Gund Dep. 155:8–24, 160:11–18). *See Bax*, 52 F.4th at 867, 869. In fact, the notices Plaintiff received communicated the *opposite* assumption; they communicated to the recipient that the District Attorney's Office would assume the recipient would *not* attend unless it heard otherwise, and to the extent it anticipated attendance at all, it was limited to potential courtroom proceedings. Failure to provide an accommodation in the circumstances Plaintiff identifies here therefore cannot reflect the kind of "deliberate inaction" that constitutes deliberate indifference towards a likelihood of a violation of Plaintiff's rights. *See Updike*, 870 F.3d at 952.

### c.  **Policy-Based Claim**

The County appears to anticipate a policy-based claim by Plaintiff regarding failure to train Sheriff's Deputies. Marion Cnty. Reply 6–7, ECF No. 104. To the extent Plaintiff brings a failure-

29 – OPINION AND ORDER

to-train claim under the ADA and Rehabilitation Act, the Court applies the familiar *Monell* framework. *See Mayfield v. City of Mesa*, 2023 WL 7018051, at *7 (D. Ariz. Oct. 25, 2023) (collecting cases and analyzing ADA and Rehabilitation Act failure-to-train claims under *Monell* framework) *aff'd*, 131 F.4th 1100 (9th Cir. 2025). Plaintiff cannot succeed on such a claim here.

Under *Monell*, Plaintiff must show the County "maintains a custom, practice, or policy that amounts to deliberate indifference to [Plaintiff's] [ADA and Rehabilitation Act] rights, and the policy results in a violation of [Plaintiff's ADA and Rehabilitation Act] rights." *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91 (1978). Here, Plaintiff produces no evidence of any other instances of failures to reasonably accommodate individuals with disabilities to support a required showing of a failure to train. *See, e.g., Meehan v. Los Angeles County*, 856 F.2d 102, 107 (9th Cir. 1988) ("Proof of unconstitutional assaults by SEB agents on December 21 and March 10, standing alone, does not support a finding of liability against the County."); *Mendez v. County of San Bernardino*, 2005 WL 5801541, at *2 (C.D. Cal. Apr. 4, 2005) (holding that two separate incidents were not sufficient to establish a custom). Nor does Plaintiff produce evidence of a specific deficient policy or training failure that would have affected the outcome of her encounter. *See Harris*, 489 U.S. at 385 (requiring "direct causal link between the policy or custom and the alleged . . . deprivation" to establish municipal liability).

## II.    Section 1983

Plaintiff asserts a claim under Section 1983 for violation of her Fourth Amendment rights based on Marion County Sheriff's Deputies entering her SUV to arrest Mr. Jimerson. However, there is no vicarious liability for claims brought under Section 1983 and Plaintiff names only the County as a defendant. *Ass'n for L.A. Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986,

992–93 (9th Cir. 2011). For a claim against the County, Plaintiff must establish municipal liability based on *Monell*. 436 U.S. at 690–92. To the extent Plaintiff asserts a *Monell* claim, she argues Deputy Federico had no training regarding treatment of deaf individuals, did not understand the County's ADA obligations, and did not attempt to obtain an interpreter despite knowing an interpreter was needed and having the capability to potentially call one. Pl.'s Marion Cnty. Resp. 36. Despite these assertions, Plaintiff has not pointed the Court to any evidence of a policy, practice, or custom beyond her singular experience, and has not connected her assertions to her Fourth Amendment rights. For this reason, Defendant Marion County is entitled to judgment as a matter of law on this claim.

Furthermore, the Deputies' warrantless entry into Plaintiff's SUV, which was parked in a public place, solely to arrest Mr. Jimerson, who was in plain view in the vehicle, did not violate Plaintiff's Fourth Amendment rights. *See Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (recognizing "automobile exception"); *United States v. Stevens*, 316 F. App'x 597, 598 (9th Cir. 2009) (citing *Dyson,* 527 U.S. at 467, *Texas v. Brown,* 460 U.S. 730, 738 (1983)) ("Because the gun was in plain view and inside a movable automobile, the district court did not err in concluding it was properly seized under either the plain view or automobile exceptions to the warrant requirement."). Without an "underlying constitutional violation" there can be no liability for Marion County for maintaining an unconstitutional policy or practice under Section 1983. *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

### III.  **False Imprisonment**

Plaintiff asserts a claim for false imprisonment against Defendant Marion County based on Marion County Sheriff's Deputies' conduct in questioning her after they arrived at the Timberfest in response to the 911 call. The tort of false imprisonment has four elements: (1) the defendant

31 – OPINION AND ORDER

must confine plaintiff; (2) the defendant must intend the act that causes the confinement; (3) the plaintiff must be aware of the confinement; and (4) the confinement must be unlawful. *Fossen v. Clackamas County*, 271 Or. App. 842 (2015) (citing *Hiber v. Creditors Collection Serv. of Lincoln Cnty., Inc.*, 154 Or. App. 408, 413 (1998), *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353 (1963)). "Confinement" can include an arrest or a stop. *See id.*; *State v. Brown*, 318 Or. App. 713, 719 (2022). The parties meaningfully contest only the lawfulness of Plaintiff's purported confinement.

The undisputed facts indicate any confinement Plaintiff experienced was lawful. That Plaintiff directed her children to call 911, that the officers arrived to assist her based on that call, did so, and that she appeared to be injured all support the Deputies' reasonable belief Plaintiff was the victim of a crime and had knowledge that could aid their investigation when they spoke to Plaintiff. Gund Marion Cnty. Decl. ¶¶ 26–27, 31, 33, 37; *see State v. Fair*, 353 Or. 588, 609 (2013) (holding officers may, "in appropriate circumstances, [lawfully] stop and temporarily detain for questioning a person whom they reasonably believe is a potential material witness to a crime"); *Mouktabis v. Clackamas County*, 327 Or. App. 763, 775 (2023). Plaintiff was never arrested, and to the extent the Deputies' questioning of Plaintiff constituted a stop at all, it was reasonable for Deputy Federico to move Plaintiff to a quieter, more private area to collect basic information about the situation following or during their arrest of Mr. Jimerson. *See Fair*, 353 Or. at 612–13 ("[W]hatever the officers' initial observations, . . . , officers are not constitutionally compelled to halt an on-the-scene investigation when their suspicions rise to a particular level." (citing *State v. Taylor,* 249 Or. 268, 272 (1968)); *see also State v. Bates,* 304 Or. 519, 524 (1987) (cautioning against second-guessing officers' judgment in the field regarding need for further on-the-scene investigation and questioning of potential witnesses).

Plaintiff argues summary judgment is inappropriate because "deputies here did not obtain reliable information from Plaintiff." Pl.'s Marion Cnty. Resp. 36. However, the reliability of the information the Deputies obtained from Plaintiff, due to insufficient accommodations or otherwise, does not imply the Deputies were not justified in attempting to communicate with her. *See State v. Garcia*, 276 Or. App. 838, 852 (2016) (assessing reliability of information based on which officers decided to speak to the defendant, as opposed to reliability of information obtained from the defendant). Properly separating the analysis here from that of reasonable accommodation, Plaintiff's evidence purportedly establishing miscommunication between her and Marion County Sheriff's Deputies does not create a genuine dispute of material fact as to the reasonableness of any investigatory stop Plaintiff experienced during the Deputies' approximately two-hour response at the scene. *See Fossen*, 271 Or. App. at 848.

Defendant Marion County is entitled to judgment as a matter of law on Plaintiff's false imprisonment claim.

## IV.    Crime Victim's Rights

Plaintiff's Second Amended Complaint contains a claim for violations of her rights as a crime victim under Section 42, Article I of the Oregon Constitution ("Section 42"). SAC ¶¶ 121–26. As to the rights enumerated in Section 42(1)(a)–(g), Section 42(2) provides, "[n]othing in this section is intended to create any cause of action for compensation or damages." Or. Const. art. I, § 42(2); Or. Rev. Stat. § 147.417. Instead, Section 42 contemplates, "[a] victim may assert a claim for a right established in this section in a pending case, by a mandamus proceeding if no case is pending or as otherwise provided by law," or as provided by the state legislature "for further effectuation of the provisions of this subsection." Or. Const. art. I, § 42(3). The state legislature enacted Or. Rev. Stat. §§ 147.500 to 147.550 to "effectuate" Section 42, but nowhere has it created

33 – OPINION AND ORDER

an accompanying cause of action for damages against a governmental entity, as opposed to restitution from a criminal defendant. *See State v. Lynch*, 305 Or. App. 122, 130 (2020); *State v. Fox*, 370 Or. 456, 468–69 (2022) (*en banc*). Nor has the Oregon legislature connected the rights established by Section 42 to other statutory causes of action, aside from those establishing the writ of mandamus (Or. Rev. Stat. §§ 34.105– 34.240). *See State v. Thompson*, 257 Or. App. 336, 342–43 (2013) (discussing statutory implementation of remedies associated with Section 42). It is not connected to Or. Rev. Stat. § 659A.142, which Plaintiff cites as a basis for relief. SAC ¶¶ 124–25. There is otherwise no implied private right of action for damages under the Oregon Constitution. *German v. Eudaly*, 2018 WL 3212020, at *5 (D. Or. June 28, 2018) (citing *Hunter v. City of Eugene*, 309 Or. 298, 303–04 (1990)). Accordingly, Plaintiff has no legal basis to assert a claim under Section 42, Article I of the Oregon Constitution.

## CONCLUSION

As to the Motions before the Court, Plaintiff fails to establish a genuine dispute of material fact, and on the undisputed facts, Defendants State of Oregon and Marion County are entitled to judgment as a matter of law on all of Plaintiff's claims.

As to Defendant State of Oregon, because the undisputed facts show the State reasonably accommodated Plaintiff and did not act with deliberate indifference towards Plaintiff's need for accommodation, the State's Motion for Summary Judgment (ECF No. 73) is GRANTED.

As to Defendant Marion County, the undisputed facts show the County did not violate the ADA, Rehabilitation Act, or Oregon law during Plaintiff's interactions with Marion County Sheriff's Deputies or Marion County Assistant District Attorneys. Further, Plaintiff has not created a genuine dispute of material fact as to her remaining claims against the County under Section 1983

and Oregon law, and Plaintiff's claims fail as a matter of law. Accordingly, Defendant Marion County's Motion for Summary Judgment (ECF No. 86) is GRANTED.

IT IS SO ORDERED.

DATED this 16th day of June 2026.

_____s/Michael J. McShane_____
Michael J. McShane
United States District Judge

35 – OPINION AND ORDER